Filed 4/11/22  In re K.G.-C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re K.G.-C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent;<br><br>v.<br><br>K.G.,<br><br>Defendant and Appellant. | E077581<br><br>(Super.Ct.No. J267130)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Reversed and remanded with directions.

Elizabeth A. Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven O'Neill, Interim County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

K.G. (mother) appeals from an order terminating her parental rights to her now-ten-year-old daughter K.G.-C. (K. or child). She contends that the juvenile court erred by refusing to apply the parental-benefit exception to termination. She also contends that Children and Family Services (CFS) erroneously failed to comply with the inquiry requirements of state statutes implementing the Indian Child Welfare Act (ICWA).

We will hold that the juvenile court properly found that the parental-benefit exception did not apply. However, CFS concedes that it failed to carry out its duty of inquiry. Accordingly, we will reverse, but only conditionally. If, after a proper inquiry, the juvenile court finds that ICWA does not apply, it must reinstate the order terminating parental rights.

I

FACTUAL AND PROCEDURAL BACKGROUND

As of August 2016, K. was four years old. The biological father was incarcerated; the mother was no longer in a relationship with him.

Police responded to a report that the child was home alone, out in the front yard, crying. When the mother arrived, she said she had gone shopping, leaving the child in the care of her then-boyfriend and a second man. The mother also reported that the boyfriend had physically abused her. When the two men arrived, they were arrested.

In September 2016, the boyfriend went to the home to get his belongings. He found the mother in the garage with approximately seven men. According to the

boyfriend, she was partially undressed and was performing oral sex on one of the men in the presence of the child. He took the child and called the police.

The mother claimed that the men were there to protect her from the boyfriend. She denied any sexual activity and denied that the child was present. However, she admitted that the men were using methamphetamine, and that she had recently used methamphetamine. The child said the mother was in the garage arguing with a male friend; she denied that anyone was undressed.

The mother was arrested. Thus, CFS detained the child and filed a dependency petition regarding her. The child was placed in a foster home.

Thereafter, the mother admitted suffering domestic violence at the hands of her boyfriend. She also admitted using methamphetamine "off and on" for 15 years.

In October 2016, at the jurisdictional/dispositional hearing, the juvenile court sustained jurisdiction based on failure to protect and failure to support. (§ 300, subds. (b), (g).)[1] It formally removed the child from the parents' custody. It ordered reunification services for the mother only. The mother became homeless and failed to comply with her reunification services plan.

In September 2017, the child was placed in a second foster home.

In October 2017, the juvenile court terminated reunification services and set a hearing pursuant to section 366.26.

---

[1] This and all further statutory references are to the Welfare and Institutions Code.

3

In July 2018, the father was released from custody. In September 2018, he filed a section 388 petition, asking the juvenile court to order reunification services for him and to vacate the section 366.26 hearing. In December 2018, the juvenile court granted the father's petition.

Meanwhile, in or around September 2018, the child was placed in a third foster home. In August 2019, she was placed in a fourth foster home, with the L.'s.[2]

In September 2019, the father was killed in a "drug transaction gone wrong."

In or before November 2020, the L.'s decided that they wanted to adopt K. Accordingly, in December 2020, the juvenile court set another section 366.26 hearing.

In August 2021, at the section 366.36 hearing, the juvenile court found that K. was adoptable and that there was no applicable exception to termination of parental rights. Hence, it terminated parental rights.

## II

## THE PARENTAL-BENEFIT EXCEPTION

The mother contends that the juvenile court erred by finding that the parental-benefit exception to termination did not apply.

---

[2] The report for the section 366.26 hearing said that the L.'s were the child's fifth foster placement. If so, then there was one placement not otherwise reflected in the record.

A.      *Additional Factual Background.*

The evidence before the juvenile court at the section 366.26 hearing consisted of three specified social workers' reports, plus the mother's oral testimony. The mother also cites earlier social workers' reports, which were not introduced at the section 366.26 hearing. Those reports are irrelevant; we cannot and we do not consider them. (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 207-208.)

The mother's visitation had been consistent. Starting in December 2020, she was allowed unsupervised visitation, in her home, once a week, for two hours at a time.

K. understood the concept of adoption, i.e., "that her biological mother's parental rights would be terminated and that the current prospective adoptive parents would become her legal parents."

As of March 2021, K. was "waver[ing]" between wanting to live with the mother and wanting to be adopted by the L.'s. CFS therefore asked the juvenile court to continue the section 366.26 hearing.

Generally, in the presence of the L.'s, she said she wanted to be adopted by them; twice, however, outside their presence, she had said she wanted to return home.

Specifically, in September 2020, she said she wanted to live with the mother.

In October 2020, however, she said on three occasions that she wanted to be adopted by the L.'s. She even said this at a team meeting, in front of the mother.

In January 2021, she said she had changed her mind and did not want to be adopted.

5

An unspecified time later, she said she wanted to be adopted by the L.'s, because (1) during unsupervised visits, the mother left her with the mother's grandmother while running errands, and (2) she felt the L.'s "can provide for her and can better prepare her for her future."

The mother contacted the social worker; she denied leaving K. with her grandmother, and said K. wanted to talk to the social worker. The next day, K. contacted the social worker and retracted her statement — evidently "under pressure" from the mother. Nevertheless, in that same conversation, she said again that she wanted to be adopted by the L.'s.

According to K.'s therapist, she called the L.'s "mom" and "dad" and wanted to be adopted by them.

In April 2021, the mother's visitation was changed to supervised, once a week for two hours at a time. K. said she enjoyed the visits. The mother was "appropriate" and engaging."

According to the mother, K. was happy and excited to see her. They would talk, play games, and watch movies. K. called her "mommy." At the end of visits, K. would "squeeze[] [her] really hard." Sometimes at the end of a visit, K. would cry. When she did, the mother comforted her.[3]

---

[3] The mother testified that, at the end of visits, K. "typically" said she wanted to come home. Counsel for CFS objected. The mother's counsel said he was not offering the statement for its truth, and the juvenile court ruled that it was not admissible for its truth. The mother does not claim this was error.

As of July 2021, K. said "she loves her mother very much[,] but[] would like her current prospective adoptive home to be her forever home."

When asked about the mother, K. said "she has a good relationship with her biological mother."

When asked about the L.'s, she said "she wants [them] to be her forever home. . . . [T]he prospective adoptive parents meet her needs and . . . offer more support and encouragement than she has had in the past." She said she saw them as her mother and father.

As of the date of the section 366.26 hearing, K. had been placed with the L.'s for two years. In the social worker's opinion, she was "attached" to them.

B.      *Additional Procedural Background.*

At the section 366.26 hearing, the mother's counsel argued that the parental-benefit exception applied.

Minor's counsel supported termination of parental rights. She said, "It is clear . . . that she wants to move forward with the adoption. The information that is provided in the report as to her perception is very consistent with our conversations with her, even as recently as today."

The juvenile court ruled that the parental-benefit exception did not apply. It explained: "[The first prong of th[e] test . . . has been met, the regular visitation. The second prong has not been met. The Court would have to find that severing the relationship would result in great harm to the child. Mother has the burden of proving

that to the Court.  She has failed to meet that burden.  It should be noted, 'The parent [who] failed to reunify with the adoptable child may not derail the adoption merely by showing the child will derive some benefit from continuing the relationship maintained during periods of visitation with the parent.'  Also, 'A child should not be deprived of an adoptive parent when a natural parent has maintained the relationship that may be beneficial to some degree but does not meet the child's need for a parent.'"

C.     *Discussion*.

""""[A]t a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child — adoption, guardianship or long-term foster care." [Citation.]  At this stage of the dependency proceedings, adoption is preferred because it ensures permanency and stability for the minors.  [Citations.]' [Citation.] Thus, as a general rule, at a section 366.26 hearing, if the trial court finds that the child is adoptable, it must select adoption as the permanent plan and terminate parental rights. [Citation.]

"However, there are several exceptions to this rule.  [Citation.]  One such exception applies if '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.]

"The leading California Supreme Court case regarding the parental-benefit exception is [*In re*] *Caden C*. [(2021)] 11 Cal.5th 614 [(*Caden C.*)] . . . .  Under *Caden*

*C.*, to establish the parental-benefit exception, a parent must prove three elements: '(1) *regular visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child.'  [Citation.]

"In 'assess[ing] whether "the child would benefit from continuing the relationship," . . . the focus is the child. . . .  [T]he relationship may be shaped by a slew of factors, such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]'  [Citation.]

"'[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home.  [Citation.]'  [Citation.] The court must ask, 'does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" [Citation.]'  [Citation.]

"'[A] substantial evidence standard of review applies to the first two elements.' [Citation.]  But 'the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion.'  [Citation.]  'A court abuses its discretion only when """the trial court has exceeded the limits of legal discretion by making an

9

arbitrary, capricious, or patently absurd determination."'" [Citation.]' [Citation.]" (*In re L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 205-207.)

The mother claims "it is unclear from the court's ruling whether or not the court found the second element of the exception had been established . . . ." The juvenile court specifically stated, however, "The second prong has not been met."

The mother argues that the trial court considered matters that are improper or irrelevant under *Caden C.* As she notes, it paraphrased and evidently relied on *In re Angel B.* (2002) 97 Cal.App.4th 454, which said: "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent. [Citation.]" (*Id.* at p. 466.) She argues that this is inconsistent with *Caden C.*

Recently, in *In re L.A.-O.*, we noted that case law before *Caden C.* required a parent to prove that he or she occupied a "parental role." (*In re L.A.-O.*, *supra*, 73 Cal.App.5th at p. 209.) We held that this term is regrettably ambiguous. If understood as requiring the parent to prove "a substantial, positive, emotional attachment," it is perfectly consistent with *Caden C.*; however, if understood as requiring the parent to prove that the parent is a good parent, is the child's primary attachment, or has carried out

10

typical parental tasks, it is inconsistent with *Caden C.* (*In re L.A.-O., supra,* at p. 210.) There, because it was not clear what the juvenile court meant by its "terse" finding that the parents "ha[d] not acted in a parental role in a long time," we reversed and remanded with directions to reconsider. (*Id.* at pp. 211-212; see also *In re D.M.* (2021) 71 Cal.App.5th 261, 264, 270-271 [in light of *Caden C.*, juvenile court considered "improper factors"]; *In re J.D.* (2021) 70 Cal.App.5th 833, 863-865 [same]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229-1230 [same].)

Here, the juvenile court's quotation of *In re Angel B.* — indicating that the mother had not proven that she was "'meet[ing] the child's need for a parent'" — was similarly terse and cryptic. We cannot tell whether the trial court meant that the mother had not proven a substantial, positive, emotional attachment. Accordingly, if that were the only basis for its ruling, we would reverse and remand.

But it was not. The juvenile court made an additional finding that amply supports its ruling: It found that the mother had not proven detriment from severing the relationship.[4]

*The mother does not even claim that she proved detriment.* Instead, she argues that she proved a significant, positive emotional relationship, and therefore the burden shifted to CFS to *disprove* detriment. She then argues that the social workers' reports fell

---

[4] The mother does not take issue with the juvenile court's statement that, for the exception to apply, "The Court would have to find that severing the relationship would result in *great* harm to the child." (Italics added.) To the contrary, she agrees that it would require a finding "' . . . that the child would be greatly harmed . . . .'"

11

short of doing so.  This gets the burden of proof exactly backwards.  The parent must prove all three elements of the parental benefit exception, including detriment.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

Moreover, regardless of who had the standard of proof, there was substantial evidence that the child would not suffer detriment.  As of late 2020 and early 2021, she had been with the L.'s for only a little over a year, after three or four failed placements.  Understandably, she was wavering as to whether being adopted by them was worth losing her relationship with the mother.  Even so, she said again and again that she did want to be adopted by the L.'s.  Apparently there were only two exceptions — once in September 2020 and once in January 2021.

Because she had been "waver[ing]," the juvenile court continued the section 366.26 hearing for four months.  Thereafter, it appears that she never wavered again; she consistently said that she wanted to be adopted.  She told both the social worker and her therapist that she saw the L.'s as her mother and father.  She said she had a "good relationship" with the mother, but she wanted the L.'s to be her "forever home."

It does not appear that the juvenile court's possible error in considering whether the mother "[met] the child's need for a parent" compromised its further finding that termination of parental rights would not be detrimental.  Thus, even assuming it did err, on this record, if we were to remand with directions to reconsider, there is no reasonable probability that the juvenile court would find that termination of parental rights would be detrimental.  (See *In re A.R.* (2021) 11 Cal.5th 234, 252.)

ICWA-RELATED INQUIRY REQUIREMENTS

The mother contends that the juvenile court erred by finding that ICWA did not apply because CFS failed to comply with the inquiry requirements of state statutes implementing ICWA. CFS concedes the error.

A. *Additional Factual and Procedural Background*.

The mother said she had no Indian ancestry.

The father said he did have Indian ancestry, on his father's side; he did not know from which tribe. He added that his father was still alive.

In May 2019, CFS gave notice to the Bureau of Indian Affairs. It listed the names and addresses of the father's father and mother. It also listed the names of his grandparents on his father's side (who were deceased), but not on his mother's side. It listed the name of the mother's deceased mother and said that the mother's father was unknown.

No response was received. In December 2019, the juvenile court found that ICWA did not apply. In August 2021, when it terminated parental rights, it found that notice had been provided in accordance with state statutory ICWA requirements.

B. *Discussion*.

A social services agency has "an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).) If it has reason to believe that a child is an

Indian child (*id.*, subd. (d)), it must "[i]nterview[] . . . extended family members to gather the information" necessary for an ICWA notice. (*Id.*, subd. (e)(1)(A); see also § 224.3, subd. (a)(5).) It must also "contact[] . . . any other person that may reasonably be expected to have information regarding the child's membership status or eligibility." (§ 224.2, subd. (e)(2).)

"Under both ICWA and California law, '"extended family members"' include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' [Citations.]" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053.)

Here, there is no evidence that CFS attempted to interview any of the mother's or the father's extended family members. Social workers were in contact, directly or indirectly, with (1) the paternal grandmother, (2) two paternal aunts, (3) the maternal great-grandmother[5], and (4) two maternal aunts. They also had the names and addresses of the paternal grandfather and grandmother and a third paternal aunt. However, if they made any ICWA inquiry of these relatives, they did not document it.

This failure to make a documented inquiry to the parents' family members violated CFS's statutory obligations. (See *In re K.R.* (2018) 20 Cal.App.5th 701, 707-709.) As a result, the ICWA notice that CFS did send was lacking information that likely

---

[5] Sometimes referred to as the maternal grandmother; however, the maternal grandmother was reportedly deceased, and this appears to have actually been the mother's grandmother (i.e., the child's maternal great-grandmother).

could have been obtained from these family members, such as the paternal grandfather's former address, birthdate, and birthplace.  Accordingly, there was insufficient evidence that ICWA did not apply.  (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408.)  The appropriate appellate remedy is a conditional reversal and limited remand with directions to make the necessary inquiry.  (See *id*. at pp. 408-409.)

IV

DISPOSITION

The order appealed from is conditionally reversed.  On remand, the juvenile court must require CFS to comply with the inquiry and, if necessary, the notice requirements of ICWA and related federal and state law; then it must determine whether ICWA applies. If it determines that ICWA does apply, it must proceed accordingly.  If it determines that ICWA does not apply, it must reinstate the order terminating parental rights.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ                     
P. J.

We concur:

CODRINGTON            
J.

RAPHAEL               
J.